H. M. SILVERSTEIN and Continental Illinois National Bank and Trust Company, Co-Executors of the Estate of Mary H. Thompson, Deceased, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 17460.

United States Court of Appeals Seventh Circuit.

Dec. 1, 1969.

---

David E. Dickinson, David I. Hoffman, Alvin L. Kruse, Chicago, Ill., for plaintiffs-appellants.

Johnnie M. Walters, Asst. Atty. Gen., Matthew J. Zinn, Lee A. Jackson, Crombie J. D. Garrett, Benjamin M. Parker, Attys., Tax Division, Dept. of Justice, Washington, D. C., Thomas A. Foran, U. S. Atty., Chicago, Ill., for defendant-appellee; Richard A. Makarski, Asst. U. S. Atty., of counsel.

Before KILEY, FAIRCHILD and KERNER, Circuit Judges.

KILEY, Circuit Judge.

Plaintiffs have appealed from a summary judgment against them in their suit for refund of additional assessments of income tax paid by Mary Harding Thompson[1] (taxpayer) for the years 1959, 1960 and 1961. We affirm.

The facts were presented in a stipulation and an affidavit of plaintiff Silverstein: In 1939 taxpayer's father, George F. Harding, died testate, naming Jessie Katz trustee of a testamentary residuary trust from which taxpayer was to be paid out of income and, if necessary, from corpus, $12,000 per year in monthly installments for life. Her two children thereafter were to receive $6,000 per year in monthly installments for life. All income from the trust not directed to these payments was to be paid to the George F. Harding Museum, and on the death of all three income beneficiaries the trustee was to distribute the trust residue to the Museum.

Subsequent to the 1942 amendment of the Internal Revenue Code which imposed a tax on payments of income from trusts, a dispute arose between the tax-

---

1. Mary Harding Thompson filed this suit, but died January 27, 1966, and the co-executors of her estate were substituted as plaintiffs by order of court on October 24, 1966.

payer, trustee and Museum with respect to whose obligation it was to pay the income tax on the payments.

By virtue of an agreement made in 1951 by taxpayer, trustee and Museum, taxpayer paid the tax each year until 1957 and was reimbursed by the trustee. In the agreement, taxpayer and Museum reserved the right to seek a court's interpretation whether the trust ought to be charged with the tax. In the event of an interpretation adverse to taxpayer, she was to repay to the trust the sums she received each year as reimbursement from the trustee. The Museum's interest in reserving its right to seek an interpretation was to protect its remainderman interest.

In 1957, for personal reasons, the trustee filed suit in Circuit Court of Cook County requesting approval of her accounts, construction of the will with respect to the obligation to pay income tax, and permission to resign as trustee.

While the circuit court suit was pending, the trustee, taxpayer and Museum reached an agreement on January 15, 1959 which was approved by the circuit court and adopted in its decree. Under the terms of the agreement, Jessie Katz was permitted to resign as trustee,[2] the trust was terminated, the taxpayer and her children gave up their trust interests, and the trust assets were transferred "absolutely" to the Museum. The Museum assumed the obligation to make certain annuity-like payments to the taxpayer and her children, *for the same amounts and periods as under the trust,* and to pay the income tax on these payments. The Museum and taxpayer again reserved the right to seek an interpretation by a court whether the income tax payments should continue to be made by the Museum or whether these payments made by the Museum or the

trustee should be repaid to the Museum by taxpayer.

■■ Under the agreement, taxpayer received from the Museum $10,000 in 1959 and $12,000 in 1960 and 1961. She filed returns for each year, reporting the receipt of payments but treating them as resulting in no taxable gain. The Commissioner considered the receipts ordinary income and assessed deficiencies, for the three years, totaling $18,357.50 plus $4,229.32 interest. Taxpayer thereafter paid the assessments, unsuccessfully claimed refunds from the Director, and brought this suit for the refund. Each party filed a motion for summary judgment in the district court, thus eliminating any notion of the existence of a genuine issue of material fact.[3] The court entered summary judgment for the government. This appeal followed.

The district court concluded that the transaction resulted in no sale of a capital asset and that what actually occurred was simply a change in administration of the trust funds, that no capital gains treatment should be afforded taxpayer, and that the gain reported should be taxed as ordinary income. The court thought the transaction a "sham, not really a sale." It reasoned that the taxpayer had exchanged a right to periodic payments for the same right, and that the Museum continued as remainderman with the additional function of serving as payor of the annual payments.

■ We think it is unnecessary to reach the question of whether a capital asset is involved in this transaction, and that we need only decide whether the transaction pursuant to the 1959 agreement was a "disposition of property" within the statutory language of Section 1001 of the Internal Revenue Code of 1954.

2. The successor trustee nominated by the testator refused to serve.

3. The government's brief argues—in support of the district court's reasoning with respect to the nature of the transaction —in terms of "findings," and seeks application by us of the "clearly erroneous" rule to these "findings." Since the judgment was summary, the "clearly erroneous" rule is inapplicable. We take the alleged "findings" to be subordinate conclusions of law.

Section 1001(a) of the Code provides in part:

> The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, * * *.

Taxpayer contends that she disposed of her property within the meaning of this section and was entitled to receive the annual payments from the Museum without reporting income, until the aggregate she recovered from such payments was equal to the amount of her basis in the trust interest she disposed of. She argues that because she received an amount for the three years in question unequal to the total amount she was entitled to receive in the disposition of her trust interest, no gain should be recognized.

We agree with the district court that the taxpayer was in virtually the same economic position after the 1959 agreement as she was before. We interpret the district court opinion as holding there was no disposition of property by the taxpayer. We hold that the taxpayer did not "sell or dispose of" her property within the meaning of Section 1001. Accordingly we need not discuss Blair v. Commissioner of Internal Revenue, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937) (whether assignor of life interest or the assignee was taxable); Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958) (whether consideration received was taxable as ordinary income or a long term capital gain); Commissioner of Internal Revenue v. Gillette Motor Transport Co., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960) (whether compensation award received was ordinary income or capital gain); and Bell's Estate v. Commissioner of Internal Revenue, 137 F.2d 454 (8th Cir.1943) (whether transfer of a life interest in a trust to the remainderman was a transfer of a capital asset). In each of those cases bona fide dispositions were presupposed.

We recognize that a difference in form exists between the taxpayer's interest in the trust and her later contractual rights under the 1959 agreement. But we must look beyond the form and consider the substance and effect of the transaction. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 266–267, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958). The district court in the case before us discussed taxpayer's suggestions, to the extent it considered them significant, that the transaction had the following consequences: it resulted in loss of a fiduciary relationship, lack of an interest in a specific fund, susceptibility to a statute of limitations, and receipt of an unsecured obligation. But the court thought these changes were not "meaningful." It thought that the procedural difference between the bar of the statute of limitations and the bar of laches was not economically significant, that the receipt of an unsecured obligation was unrealistic since there was no indication that the assets received by the Museum would be insufficient to produce the annual payments, nor that even if they were insufficient per se, the entire assets of the Museum would be insufficient to do so. The court correctly queried, with respect to this latter point, that if what taxpayer received in the transaction was of less value than that which she gave, why there was not more consideration required for the transfer. The substance of the transaction before us is that the taxpayer received the same benefit after the agreement as she did before, that she was as secure with respect to the benefits after as before, that she realized no realistic or different value in the agreement than she had in the trust interest, and rid herself of nothing meaningful by the agreement.

Taxpayer relies on the decision in Gladys C. Evans, 30 T.C. 798 (1958), which was acquiesced in by the Commissioner. See 1958–46 Int.Rev.Bull. 7. There the Tax Court set aside deficiencies assessed against Mrs. Evans for payments received by her, in a transfer

to her husband, of her income interest in all the stock in a particular trust. The Commissioner thought the transaction a mere ritualistic scheme without substance and business purpose, which did not change the economic positions of the parties. In refusing to accept this view, and holding that Mrs. Evans had in substance transferred her interest in the trust, the Tax Court found that the exchange was not a sham, but was motivated by Mrs. Evans' desire to avoid the estate tax consequences as a result of her possession of a reversionary interest (see Commissioner of Internal Revenue v. Estate of Church, 335 U.S. 632, 69 S. Ct. 322, 93 L.Ed. 288 (1949), and Estate of Spiegel v. Commissioner of Internal Revenue, 335 U.S. 701, 69 S.Ct. 301, 93 L.Ed. 330 (1949)), and simultaneously receive the necessary funds for personal benefactions and for remodeling her home, both of which she did upon receipt of the monies. In addition, the amount of Mrs. Evans' interest in the trust was not definitive. It varied with the dividend return on the trust stock. She exchanged this "uncertainty" for definitely ascertained yearly payments from her husband.

In the case before us the stipulation and affidavit disclose no similar facts showing a business purpose, a change of economic position, or any need of taxpayer served by substitution of the Museum for the trustee in making the same periodic payments. And, as the district court accurately stated, in terms of pecuniary amount, "what Mary gave up with her right hand, she got back with her left."

Plaintiff Silverstein's affidavit states that the parties agreed that the trust must be terminated because first, the incompatibility of the trustee and taxpayer was giving rise to serious disputes; secondly, that the termination of the trust was needed to save the beneficiaries inconvenience and expense; and thirdly, because the beneficiaries desired to be relieved of the spendthrift provision in the settlor's will. We do not decide the additional question whether these were sufficient reasons for termination of the trust or whether, under Illinois law, the spendthrift provision could be validly terminated by the agreement. We note only in this regard that there is nothing to show what realistic value the removal of the spendthrift provision had for the beneficiaries, as, in the *Evans* case, the effect of the taxpayer's ridding herself of her trust interest had on her estate tax considerations. We hold these several reasons advanced in the affidavit are not of the quality needed to allow us to call this transaction a "disposition of property" under Section 1001 of the Code.

Affirmed.