Jerome H. **LEMELSON**, Appellant,

v.

**TRW, INC., and Conco, Inc., Appellees.**

**Appeal No. 84–855.**

United States Court of Appeals,
Federal Circuit.

April 12, 1985.

---

**1.** We do so without an opinion under Circuit Rule 25.

Richard J. Egan, Baldwin, Egan, Walling & Fetzer, Cleveland, Ohio, for appellant. With him on the brief was William C. McCoy, Jr., Pearne, Gordon, Sessions, McCoy, Granger & Tilberry, Cleveland, Ohio.

Ronald L. Wanke, Wood, Dalton, Phillips, Mason & Rowe, Chicago, Ill., for appellees. With him on the brief were Stanley C. Dalton, Wood, Dalton, Phillips, Mason & Rowe, Chicago, Ill., Hal D. Cooper, Jones, Day, Reavis & Pogue, Cleveland, Ohio, and Philip K. Fitzsimmons, Shlesinger, Fitzsimmons & Shlesinger, Rochester, N.Y.

Before DAVIS, BENNETT and SMITH, Circuit Judges.

BENNETT, Circuit Judge.

This is an appeal from the order of the United States District Court for the Northern District of Ohio, Eastern Division,[1] granting the joint motion for summary judgment brought by defendants TRW, Inc., and Conco, Inc., and defendant-intervenor Hartman Metal Fabricators, Inc. (hereinafter collectively designated TRW).[2] The order was based on a determination that U.S. Patent No. 3,389,814 (the '814 patent) and U.S. Patent No. 3,486,640

---

1. The Honorable John M. Manos, District Judge.

2. *Triax Co. v. TRW, Inc.,* 217 USPQ 336 (N.D. Ohio 1982).

(the '640 patent) issued to intervenor-appellant Jerome H. Lemelson,[3] are invalid under 35 U.S.C. § 102(b) (1982) due to a "hiatus" in prosecution disclosure of the claimed inventions, resulting in the preclusion of the asserted patents from entitlement to the filing dates of various parent applications, which filing dates could have antedated admitted public uses and offers for sale.

We vacate the order of the district court and remand for continued proceedings consistent with this opinion.[4]

3. The patents at issue in this case were originally asserted below by the Triax Company (Triax) to which they had previously been assigned by inventor Lemelson. Triax chose not to appeal from the grant of summary judgment and Lemelson sought leave to intervene, which was denied by the district court. Thereafter, the patents were reassigned to Lemelson, who appealed the denial and was granted the right to intervene. *Triax Co. v. TRW, Inc.,* 724 F.2d 1224, 221 USPQ 1133 (6th Cir.1984).

4. The discussion to follow can be summarized in outline form, which for the convenience of the reader is provided below.

I. BACKGROUND

  A. The Claimed Inventions
  B. Prosecution History
  C. Action of the District Court
  D. Issues

# I. BACKGROUND

## A. *The Claimed Inventions*

Both the '814 and '640 patents relate to specific aspects of an automatic material handling system, shown below in Fig. 1 of the '814 patent from which unnecessary reference characters have been deleted. Loads 14 are transported to and from selected storage locations in a vertical and horizontal array of open-ended bins 18a by a load carrier 15 horizontally movable before the array on an overhead track 17.

II. DISCUSSION

  A. Summary Judgment

    1. Governing Law
    2. Treatment Below
    3. Examination of the Record

      (a) Requirement for Election of Species
      (b) Election of Species
      (c) Continued Prosecution
      (d) Withdrawal by Examiner of Claims
      (e) Restriction of the Specification
      (f) Allowance and Abandonment

    4. Summary

  B. Additional Comments

    1. "Hiatus" of Disclosure
    2. Claims of the Patents in Suit

III. CONCLUSION

FIG. 1

The load carrier includes a carriage 16 which supports a horizontally rotatable and vertically positionable elevator 20. The elevator carries a load support 23 which can be moved horizontally into and out of the bins to pick up or set down articles. The movements of the carriage, elevator, and load support are governed by automatic controls.

The claims of the '814 patent recite such a system in which the automatic controls include sensors on the load carrier to detect the presence or absence of loads on the load support or within a bin being entered, thereby permitting the controls to select appropriate movements of the load carrier.[5] The claims of the '640 patent recite such a system in which the automatic controls include control elements that move with the load carrier parallel to the open ends of the storage bins. First and second actuators associated with each storage bin actuate the control elements as the load carrier approaches a selected storage bin. The automatic controls responsive to the first actuator reduce the speed of the load carrier in advance of arriving at the selected bin. In response to the second actuator the controls then stop the load carrier precisely at that bin.[6]

The sensors of the '814 patent and the pair of actuators of the '640 patent produce electrical signals which register in the automatic controls the location and status of the load carrier being regulated. These signals may be generated in alternative manners depending on the nature of the sensors and actuators: photoelectrically, using reflectors and photoelectric cells, or electromechanically, using limit switches and limit pins.

5. By way of example, claim 1, the sole independent claim in the '814 patent, has been included in Appendix A.

6. By way of example, independent claim 1 of the '640 patent has been included in Appendix B.

## B. *Prosecution History*

The original application disclosing the inventions now claimed in the '814 and '640 patents was U.S. Patent Application S.N. 449,874, filed July 28, 1954, and entitled "Automatic Production Systems" (the 1954 application). It was initially subjected to a requirement to restrict examination of the application to one of three distinct inventions identified by the examiner. Lemelson in response elected to prosecute the Group II set of claims directed to an article transfer device, which, it is not disputed, included both the load sensing means and the dual reflectors now claimed in the '814 and '640 patents, respectively.

Subsequently, in a second office action, the examiner stated that the elected Group II set of claims included "claims specifically directed to ... plural species of controls." Since claims generic to those species were not considered by him to be patentable, Lemelson was "required to elect a single disclosed species" to which his claims would be restricted if no generic claim were ultimately allowed. The examiner was of the opinion that following the required election, most of the matter disclosed in the application would be "superfluous to the elected embodiment," and thus further required the applicant to indicate those portions of the specification that pertained thereto.

Lemelson in response made his election, which was considered incomplete by the examiner. Prosecution continued through

several claim substitutions to a *fifth* office action in 1959. This action, while continuing to note the failure of Lemelson to restrict disclosure in the application to the subject matter elected for prosecution, entered a final rejection of all pending claims.

Lemelson appealed the final rejection and in 1960 cancelled the entire specification of the 1954 application and its then pending claims, substituting a substantially streamlined new specification and new claims. The 1954 application was abandoned on October 18, 1961.

Prior to that abandonment, however, Lemelson requested that the United States Patent and Trademark Office (Patent Office) prepare and file on his behalf a certified copy of his *original* 1954 application. According to Lemelson, this met the requirements of then operative Rule 147 [7] for effecting a valid filing without his signature of a divisional application entitled under 35 U.S.C. § 121 [8] to "the benefit of the filing date of the original [1954] application." The result was U.S. Patent Application S.N. 152,702 (the Rule 147 divisional application), which was accorded a filing date of October 17, 1961.

Simultaneously with the request to prepare the divisional application, Lemelson instructed the Patent Office to cancel all claims not pertaining to the Group I claims designated by the examiner in the parent 1954 application as being directed to an automatic production system. These claims were accordingly elected for prose-

---

**7.** 37 C.F.R. § 1.147 (1960), frequently termed Rule 147, provided as follows:

"The nonelected inventions, those not elected after a requirement for restriction (§ 1.142), may be made the subjects of separate applications, which must conform to the rules applicable to original applications and which will be examined in the same manner as original applications. However, if such an application is filed before the patenting or abandonment of or termination of proceedings on the original application, and if the drawings are identical and the application papers comprise a typewritten copy of the original application as filed, certified by the Patent Office, together with a proposed amendment canceling the irrelevant claims or other matter, signing and execution by the applicant may be omitted."

Rule 147 was superseded as to applications filed after September 1, 1971, by 37 C.F.R. § 1.60 (Rule 60), which permits the unsigned filing of continuation, as well as divisional, applications. 36 Fed.Reg. 12,690 (1971).

**8.** 35 U.S.C. § 121 (1958) stated in pertinent part:

"If two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 of this title it shall be entitled to the benefit of the filing date of the original application."

cution in the Rule 147 divisional application. It is not disputed that the elected automatic production system did not include a load sensing means or dual reflectors, features now claimed in the two patents in suit.

While the Rule 147 divisional application was yet pending, Lemelson filed continuation-in-part applications that did contain claims relating to these features. These were U.S. Patent Application S.N. 430,075 filed on February 3, 1965, and U.S. Patent Application S.N. 446,326 filed April 7, 1965 (the CIP applications). U.S. Patent Application S.N. 561,307, filed June 7, 1966, a continuation of the former, matured into the '814 patent, while the '640 patent issued directly from the latter.

Triax admitted that devices embodying the inventions claimed in the '814 and '640 patents were on sale and in public use as early as 1963. As the CIP applications were filed more than one year after the admitted sale and public use, the entitlement of the CIP applications to earlier filing dates is crucial to the validity of the patents upon which this suit is premised. 35 U.S.C. § 102(b).

### C. *Action of the District Court*

This case was originally filed by Triax in 1973 and consolidated with two others by the Judicial Panel on Multidistrict Litigation the following year. *In re Triax Company Patent Litigation*, 385 F.Supp. 590, 185 USPQ 149 (J.P.M.D.L.1974).

On May 9, 1980, Triax filed a motion under Fed.R.Civ.P. 42(b) to separate certain issues for trial from others in the case. TRW, in opposing the motion, further requested leave to file a motion for summary judgment claiming in the words of the district court "that admissions made by the plaintiff in answers to interrogatories [had] ... disposed of issues of fact and [would] ... allow the court to determine the validity of the Lemelson patents as a matter of law." The Triax motion was denied on June 27, 1980, but TRW was invited to file a motion for summary judgment.

On October 21, 1980, the TRW motion was filed. It argued that "the inventions claimed by the two patents in suit were *not* continuously disclosed in a patent application pending before the U.S. Patent Office as required by 35 U.S.C. § 120," because those inventions were "deliberately" cancelled by Lemelson from the 1954 application and the Rule 147 divisional application more than one year before the filing of the CIP applications. Triax responded on November 26, 1980. The district court, agreeing with TRW, granted the motion for summary judgment, and this appeal followed.

The court below stated that when required by the Patent Office to restrict the 1954 application to one elected species of controls, "Lemelson elected to prosecute the photoelectric cell method, including the dual reflector system, rather than the electromechanical method." 217 USPQ at 339. Based on this, it termed "voluntary" the cancellation from the 1954 application of disclosure of the inventions claimed in the patents in suit. *Id.* "Lemelson not only cancelled the subject matter which the Patent Office ordered restricted from the grandparent [1954] application ..., but he also voluntarily cancelled the subject matter of the ['814 and '640] patents in issue which pertained to claims he had elected to prosecute as a result of that restriction." 217 USPQ at 342.

The voluntary cancellation was held to have "eliminated the legal equivalence of description necessary to claim a continuity of disclosure," producing "a 'hiatus' in disclosure" between the 1954 application prior to the submission of the substitute specification in 1960 and the CIP applications. 217 USPQ at 341.

It was contended below by Triax that the filing of the Rule 147 divisional application reinstated all matter cancelled from the original 1954 application. Acknowledging that this presented a question yet to be addressed by the courts, the district court termed "simply untenable" any proposition that submission of the unsigned divisional application under Rule 147 afforded "the equivalent of sufficient continuity of disclosure under 35 U.S.C. § 112 and, therefore,

relation back under 35 U.S.C. § 120" for the inventions claimed in the patents in suit. 217 USPQ at 342.

### D. Issues

There has been no contention raised that the claims of the '814 or '640 patents are other than fully supported by the specification of the 1954 application. Nor has it been argued that the two patents in suit are not related to the 1954 application through a continuous chain of co-pending applications.

Rather, the issue presented is whether throughout the prosecution of that entire chain of applications a legally adequate disclosure of the inventions ultimately claimed in the '814 and '640 patents was continuously maintained. As this is an appeal from the grant of summary judgment, particular attention must be directed to verifying the absence of contested issues of material fact, if the grant is to be upheld.

## II. DISCUSSION

### A. Summary Judgment

#### 1. Governing Law

In any type of lawsuit the purpose of summary judgment under Fed.R.Civ.P. 56 is to avoid an unnecessary trial. *Chore-Time Equipment, Inc. v. Cumberland Corp.*, 713 F.2d 774, 779, 218 USPQ 673, 675 (Fed.Cir.1983). Summary judgment is thus an important means of conserving judicial and other resources, but it must be employed carefully, "for an improvident grant may deny a party a chance to prove a worthy case." *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146, 219 USPQ 13, 15 (Fed.Cir.1983). It appears that just such an improvident grant has occurred in this instance.

In the appeal of a grant of summary judgment, such factual inferences as are material to the grant are not reviewed under the clearly erroneous standard, as if they were findings of fact made following a trial of issues. *Silverstein v. United States*, 419 F.2d 999, 1001 (7th Cir.1969), *cert. denied*, 397 U.S. 1041, 90 S.Ct. 1362,

25 L.Ed.2d 652 (1970). As a district court has no genuine discretion in determining whether to grant summary judgment, *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1377 (10th Cir.1980), a reviewing court must determine de novo, *M/V American Queen v. San Diego Marine Construction Corp.*, 708 F.2d 1483, 1487 (9th Cir.1983), that the strict standard to be applied by the district court has indeed been met. *See Trnka v. Elanco Products Co.*, 709 F.2d 1223, 1225 (8th Cir.1983); *Exnicious v. United States*, 563 F.2d 418, 423 (10th Cir.1977).

That standard is plainly stated in Fed.R. Civ.P. 56(c):

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

To affirm a grant of summary judgment, an appellate court must accordingly determine that the record demonstrates an absence of any actual dispute as to factual inferences which would have a material impact on the entitlement of the summary judgment movant to judgment as a matter of law. *See British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241, *reh'g denied*, 441 U.S. 968, 99 S.Ct. 2420, 60 L.Ed.2d 1074 (1979). For summary judgment, fact-finding is an inappropriate exercise, at either the appellate or the district court level. If a dispute requiring a finding exists as to any material fact, summary judgment is improper. *Fountain v. Filson*, 336 U.S. 681, 683, 69 S.Ct. 754, 755, 93 L.Ed. 971, *reh'g denied*, 337 U.S. 921, 69 S.Ct. 1153, 93 L.Ed. 1730 (1949).

The issue of material fact required to be present by Fed.R.Civ.P. 56(c) in order to entitle a party to proceed to trial in the face of an adverse motion for summary judgment need not be resolved conclusively in favor of the party asserting its exist-

ence. All that is required is a showing of sufficient evidence supportive of the existence of the claimed factual dispute to require a judge or jury to resolve the differing versions of the truth through a trial. *First National Bank v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, *reh'g denied,* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968). Further, as an additional precaution against denying a party its chance to prove a worthy case, any doubt as to the presence or absence of disputed issues of material fact must be resolved in favor of the presence of disputed issues, or in other words in favor of the party opposing summary judgment. *Petersen Manufacturing Co. v. Central Purchasing, Inc.,* 740 F.2d 1541, 1546, 222 USPQ 562, 565–66 (Fed.Cir.1984); *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1571, 220 USPQ 584, 588 (Fed.Cir.1984). We are persuaded that the evidence in this case demonstrates the existence of a disputed, highly material issue of fact.

### 2. *Treatment Below*

██ Essential to the conclusion by the district court that the '814 and '640 patents are invalid is its assessment of what species of controls for the Group II invention was chosen by Lemelson in response to the requirement to elect a single of such disclosed species. The court stated that "Lemelson elected to prosecute the photoelectric cell method, including the dual reflector system, rather than the electromechanical method." 217 USPQ at 330.

The question of what species is actually elected responsive to a requirement to do so is one of fact. Given its grant of summary judgment and the materiality thereto of the identity of the elected species, it must be assumed that the district court concluded that no genuine issue had been demonstrated in the record before it as to that factual question. In this conclusion we cannot concur, and it is upon such a basis that we vacate for continued proceedings. The discussion that follows is directed largely toward demonstrating from the record before us why the identity of the elected species could not be considered free from genuine dispute.

Lemelson on appeal contends that in response to the examiner's requirement to elect one species of controls, he elected a "counting means" of controls. It is understood that by use of the term "counting means," Lemelson is attempting to designate controls that determine the location of the load carrier by counting feedback pulse signals generated each time the load carrier passes one of the storage locations in the array of bins. "Counting means" of controls are then to be distinguished from controls that slow the carrier prior to stopping it at a designated storage location, as in the '640 patent, or controls that vary its movement depending on the presence of loads on the load support or within a bin it is entering, as in the '814 patent. The feedback pulses of the "counting means" of control may be generated photoelectrically or electromechanically, thus giving rise at least conceptionally to corresponding variants of the generalized "counting means."

This argument is based essentially on materials appearing in the file wrapper of the 1954 application,[9] which we assume was before the district court when it decided to grant summary judgment. Our examination of the file wrapper reveals the identity of the elected species of controls to be an extremely unclear question. Although aspects of the prosecution history

---

**9.** The parties have not presented to this court other filings which may have been considered by the district court, such as pleadings, depositions, answers to interrogatories, or affidavits, listed in Fed.R.Civ.P. 56(c). At this point in the proceedings, it must be concluded that these, if they were filed in this case, do not support summary judgment, otherwise they would have at least been mentioned by the district court in its memorandum of opinion in support of summary judgment or by TRW in opposing this appeal. In particular, in this regard, we have in mind the "admissions made by the plaintiff in answers to interrogatories" which were noted by the district court in granting TRW leave to file a motion for summary judgment as having been claimed by TRW to "have disposed of issues of fact."

depicted therein might serve to evidence that Lemelson elected a "photoelectric species" of controls, other aspects of that history, by no means insignificant, point to contrary inferences, including the "counting means" advanced by Lemelson. Some particulars will serve to illustrate.

### 3. *Examination of the Record*

#### (a) *Requirement for Election of Species*

Contrary to the either/or implication of the statement by the district court that Lemelson elected to prosecute "the photoelectric cell ... rather than the electromechanical method," the examiner's initial requirement for election in no way suggested the existence of but two species of controls, or drew a clear dichotomy between photoelectric and electromechanical methods. He referred only to "plural species of controls such as [shown in] Figs. 5, 7, 8, 20, 22, 23, 24 and 25" and invited the applicant to elect that species to which the application should be restricted. As best can be determined, throughout the entire prosecution history, the examiner offered no explicit characterization of the nature of the plurality of species he observed.

#### (b) *Election of Species by Lemelson*

Lemelson's initial attempt at election is no more helpful. He said:

> In accordance with the requirement for election, new claims 38 to 41 have been added which read on the provisionally elected species illustrated in Figs. 24, and also shown in Figs. 28, 7, 8 and 27. The new claim 38 is generic and reads on this species. Claims 39 to 41, and 32 to 36 also read on this species.

The applicant, like the examiner, failed to make any explicit characterization of the provisionally elected species.

The figures designated as illustrating it depict in various levels of detail, including some alternative configurations, an auto-matic warehousing system which could be fairly characterized as employing controls which are "photoelectric," or "counting," or both. No inference one way or the other in the matter is compelling.

The claims put forward by Lemelson as reading on the elected species give contrasting, but also mixed, indications as to what he had actually selected. The new claims 39–41 depended directly or indirectly from new claim 38. In claim 38[10] the degree of motion of the carriage along the predetermined path of the conveyor recited is controlled by a "feedback signal generating means for indicating by pulse signal transmission ... the position of said carriage along said path," a recitation consistent with a counting species of controls and broad enough to include photoelectric or electromechanically signal generation. In claim 38 signal generation was accomplished using photoelectric scanning parallel to the travel path in order to produce a series of feedback pulses, each corresponding to passage of the carriage by stations along its path of travel. By contrast, in claim 35, also selected by Lemelson as "reading on this species," electromechanical means were recited as performing the same function, this despite the failure of Figs. 7, 8, 24, 27, or 28 to illustrate electromechanical controls. None of the claims designated by the applicant recite structures or functions corresponding to the load sensing means now claimed in the '814 patent or the dual reflectors for effecting carriage deceleration and stopping, as claimed in the '640 patent.

TRW argues that the selection of Fig. 28 by Lemelson as illustrating the elected species shows that the device now claimed in the '640 patent was part of the species elected for prosecution in the 1954 application. Figure 28 below illustrates electrical circuit details of the photoelectric scanning devices depicted only generally in Figs. 7, 8, 24 and 27. Light source

---

**10.** The full text of the numerous unissued claims which are paraphrased in the subsequent discussion will not be included with this opinion. Nevertheless, all relevant claims appear in the file wrapper of the 1954 application, which is available to the district court for its future deliberations.

**FIG. 28**

69 located on the mobile load carrier directs a beam of light upon the stationary framework 151 and 152 at the open ends of an array of storage bins. Reflectors, such as reflector 70, attached to framework 151 and 152 so as to correspond to a single storage location, return light to a photoelectric cell 68 when movement of the carrier brings one of them within the beam produced by light source 69. Photoelectric cell 68 in turn produces an electrical signal which is amplified in a vacuum tube circuit 163 to actuate a relay 164'. Signals from relay 164' are processed by a feedback pulse counting means PR$_c$.

TRW points out that, adjacent to reflector 70, Fig. 28 also depicts a second reflector 70a which is capable of affecting photoelectric cell 68 in order to slow the carriage prior to its being stopped precisely at reflector 70. Second reflector 70a is thus the second of the dual reflectors claimed in the '640 patent. Its presence in Fig. 28 is asserted by TRW to evidence that the dual reflectors were within the scope of the species of controls elected by Lemelson for prosecution in the 1954 application.

With this contention we cannot agree. First, the enumeration of figures in which an elected species is illustrated cannot always be interpreted as meaning that everything in those figures is part of the elected species. To do so here would presume such clairvoyant foresight on the part of Lemelson in preparing his application that he would have been able to produce figures, the depictions of which corresponded

precisely to the boundaries of distinct inventions and species thereof undetermined until prosecution. The 1954 application contained 52 pages of written disclosure, 29 figures, and 20 pages of claims. It evidences no such degree of order or preplanning.

Also, Fig. 28 is fully operable, even absent the inclusion of second reflector 70a. The description of that feature and the possibility of carriage slow-down prior to stopping appear in a separate location in the specification from where the rest of Fig. 28 is initially described.

Among the figures designated as illustrating the subject matter elected for prosecution, none other than Fig. 28 depicts photoelectric scanning circuitry in any degree of detail. Thus, the portions of that figure that illustrate such circuitry complement the embodiments in the other figures elected by Lemelson, which also show a reflector 70. On the other hand, none of the other figures contain a second reflector. That aspect of Fig. 28 involving second reflector 70a is actually in conflict with the embodiment depicted in Figs. 7, 8, 24, and 27. In view of the diminutive disclosure of specific circuitry in the 1954 application, a situation noted on several occasions throughout prosecution by the examiner, it would have been reasonable for Lemelson to designate Fig. 28 as illustrating his elected species of controls, whether or not it contained depictions of extraneous elements not relevant thereto, such as second reflector 70a.

In addition, all of the claims elected by Lemelson at this point, and subsequently in prosecution of the 1954 application, were concerned with feedback pulses used to locate the carriage; no recitation was made of a species of controls which would slow it prior to stopping.

In the absence of statements of the examiner regarding his view on the identities of the "plural" species of controls, and without a clear expression by Lemelson of what species he considered he was electing, it would be unwarranted to insist rigidly that everything in the figures he designat-

ed, particularly in Fig. 28, was necessarily part of the elected species. The inclusion of second reflector 70a in originally filed Fig. 28, prior to any restriction of the specification to elected subject matter, may support an inference that the elected species of controls included the dual reflector means of slowing and then stopping the carriage. Nevertheless, a contrary inference is also supportable from the record.

Matters are less evenly divided regarding whether the load sensing means claimed in the '814 patent was part of the species of controls elected by Lemelson. At this point, and subsequently throughout prosecution of the 1954 application, none of the expressions of the examiner or Lemelson touched on controlling the load support in its movements into and out of selected storage bins. No claims presented for prosecution recited or suggested such functions or associated structure. Figure 26, the sole figure depicting any sort of load sensing means, was never designated by Lemelson as being in any way illustrative of the elected species of controls.

The evidence is not clear that Lemelson elected either a species of controls for the entire material handling system or for all carriage movements. It may alternatively be inferred that he elected a species of controls which employed the counting of feedback pulses in order to locate the carriage of the apparatus at a preselected position in its path of travel, be it photoelectric or electromechanical. The balance of the prosecution history in no way eliminates a dispute as to this factual issue.

### (c) Continued Prosecution

The third office action, dated April 11, 1958, found Lemelson's election to have been incomplete for reasons related, not to the designated claims, but to the figures selected to illustrate the species. These, it said, covered "alternate forms of control elements for various portions of the controls" and thus failed to "present a *single* preferred embodiment of the invention." The applicant was again directed to designate those portions of the specification that

were "limited to the *single elected* embodiment." (Emphasis in original, both instances.)

The inventor's response on October 14, 1958 (the 1958 response) cancelled claims 32–36 and 39–41, those designated in the preceding response as reading on the elected species. New claims 42–49 were added, the broadest being claim 42, which was accurately described by Lemelson as reciting a "conveying means as a self-contained unit with its own servo drives which are automatically controlled by an automatic controller operated by feed-back signals generated as a result of movement of the conveyor relative to the rack." No distinction was made in claims 42–44 and 49 between photoelectric and electromechanically generated feedback signals. The balance of the new claims was limited to photoelectric scanning, but no claim included either the load sensing means or dual reflectors now claimed in the '814 and '640 patents, respectively.

In the 1958 response, Lemelson stated that "Fig. 25 broadly illustrates the elected invention." Surprisingly, the system of Fig. 25 utilizes electromechanical controls. In his words, he elected for prosecution "the feed-back scanning means of Figs. 7 and 28 to be utilized in the system of Figs. 24 and 25." Though Fig. 7 illustrated photoelectric scanning and Fig. 25 depicted electromechanical switches, it was argued that both performed the same function and accordingly they should be "retained as alternative forms of the same invention." The applicant identified by page number in the specification the individual descriptions of Figs. 7 and 24–28, but retained in the application all figures and specifications "pending the filing of a divisional application."

### (d) Withdrawal by Examiner of Claims to Nonelected Species

In the fourth office action, dated April 8, 1959, the examiner continued to press for restriction of the specification to the "elected and claimed invention." For the first time, the presence was noted in the applica-

tion of allowable subject matter in the form of that recited in claim 48. The controls recited in claim 48 employed counting of feedback pulses generated by photoelectric scanning as the carriage moved along its path of travel. This claim did not recite or suggest either structure or functions corresponding to the load sensing means or dual reflectors claimed in the patents in suit.

Claims 7, 11, 12, 16, 17, 25, 30, and 37 were "withdrawn [by the examiner] from further consideration in the case as being directed to the non-elected species." The reference of the examiner to claims 17, 25, and 37, in particular, as being "directed to the non-elected species" is telling. The district court found that the species of carrier controls elected by Lemelson was "the photoelectric cell method ... rather than the electromechanical method." 217 USPQ at 339. This is in sharp contrast to the fact that claims 17, 25, and 37 each recite various configurations of controls that utilize photoelectric cells. Thus, if only from the viewpoint of the examiner, the elected species of controls could not have encompassed all use of photoelectric cells, and the nonelected species of controls did not consist exclusively of electromechanical means of controls. Subsequent events may, notwithstanding, have relevance to the identity of the elected species of controls.

### (e) *Restriction of the Specification*

Prosecution continued with Lemelson on October 12, 1959, retaining claim 48 in the application but cancelling the balance of those under consideration and substituting for them new claims 50–53. Claim 50, the sole independent claim in the new group, recited a "scanning relay" for generating position-indicating feedback pulses by scanning "identifying means" located along the path of travel. Claim 50 was asserted to be a rewritten version of claim 48.

This was disputed in the fifth office action, dated October 30, 1959, which noted again that Lemelson had yet to restrict disclosure of the specification to the subject matter elected for prosecution. The examiner then entered a final rejection of all pending claims and continued to refer to claims 7, 11, 12, 16, 17, 25, 30, and 37 as "directed to non-elected species."

Minor amendments to the specification were submitted on November 9, 1959, and to the claims on March 22, 1950. The latter were refused entry as not placing the claims in condition for allowance or in better form for appeal in a sixth office action dated April 28, 1960, which continued to note that the specification remained in need of correction, apparently in order to restrict its disclosure.

Lemelson appealed the final rejection while at the same time trying to get his application in condition for allowance.

Following an interview with the examiner, Lemelson's attorney on August 11, 1960, cancelled the entire specification of the 1954 application and its then pending claims, substituting a substantially streamlined new specification and new claims 54–56 (the substitute 1954 application).

Although not explicitly stated in the file wrapper, the new specification appears to have been submitted to meet the continuing, long-standing requirement of the examiner to delete from the 1954 application all matter not related to the elected invention and species of controls. Thus, the new specification eliminated from immediate consideration by the examiner, but certainly not from the file wrapper itself, substantial disclosure directed toward the support of claims for nonelected inventions in Groups I and II and, within Group II, for other species of controls than that elected for prosecution. Among the disclosure eliminated was that related to the load sensing means, now claimed in the '814 patent, and the dual reflectors whereby carriage slow-down precedes its actual predetermined stopping point, as now claimed in the '640 patent.

### (f) *Allowance and Abandonment of the 1954 Application*

The substitute 1954 application was deemed by the examiner to have placed the application in condition for allowance, ex-

cept for minor informalities. Following yet another interview, these informalities were corrected, and on April 18, 1961, the application containing three independent claims was allowed.

In each allowed claim a "control apparatus" was recited for positioning the carriage horizontally and the load support vertically. Each control apparatus was recited as "including a predetermining counting relay means ... to stop [the carriage] ... upon receipt of a predetermined number of position indicating feedback signals." These were generated by "a scanning relay" mounted on the carriage each time it scans one of a "plurality of sensitized markers" used to identify the position of each storage bay. While the relay means thus recited may be photoelectric, those controls are, in addition, a form of "counting means," as this term is used by Lemelson. None of the claims ultimately allowed recited functions or structure which would slow the carriage before it stops at a predetermined storage bay or would control the movement of the load carrier into or out of such a bay.

The substitute 1954 application became abandoned six months after its allowance for failure of the applicant within that time to pay the fee necessary for issuance.

### 4. *Summary*

The statement of the district court that Lemelson elected the photoelectric species of controls really constituted a finding of fact, a choice among possible inferences to be drawn from subsidiary facts presented in the evidence of record, and a bar to the grant of summary judgment.

On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion. A study of the record in this light leads us to believe that inferences contrary to those drawn by the trial court might be permissible. The materials before the District Court having thus raised a genuine issue as to ultimate fact ... it was improper for the District Court to decide the applicability of the rule on a motion for summary judgment.

*United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). From our reading of the record, it cannot be said that one explanation is the only possible interpretation of what species was elected. As the identity of that elected species is a fact essential to the legal conclusion of invalidity, the requirement of Fed.R.Civ.P. 56 that there be no genuine issue of material fact was not met. *See Cooper v. Ford Motor Co.,* 748 F.2d 677, 679–80, 223 USPQ 1286, 1288 (Fed.Cir. 1984).

The memorandum and order of the district court granting summary judgment is accordingly vacated and this case is remanded for further appropriate proceedings. No opinion is hereby rendered as to the ultimate appropriate resolution of the factual issue observed to be present. *See Waganer v. Sea-Land Service, Inc.,* 486 F.2d 955, 960 (5th Cir.1973).

### B. *Additional Comments*

The following guidance is included as to some matters addressed by the district court in its memorandum in support of summary judgment and which may again need to receive its attention on remand.

### 1. *"Hiatus" of Disclosure*

■ In order for the '814 and '640 patents to be entitled under 35 U.S.C. § 120[11] to the filing date of an earlier application in

---

**11.** 35 U.S.C. § 120 (1958) provides as follows:

"§ 120. *Benefit of earlier filing date in the United States*

"An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."

the chain of applications of which they are part, it must be shown that as to the inventions claimed there has been "continuing disclosure through the chain of applications, without hiatus." *In re Schneider*, 481 F.2d 1350, 1356, 179 USPQ 46, 50 (CCPA 1973). *Accord In re Hogan*, 559 F.2d 595, 609, 194 USPQ 527, 540 (CCPA 1977); *In re Goodman*, 476 F.2d 1365, 1368, 177 USPQ 574, 576 (CCPA 1973). The district court held such a "hiatus" to have resulted in relation to the patents in suit due to Lemelson's 1960 cancellation of matter in the 1954 application and to have continued until the filing of each of the CIP applications. 217 USPQ at 341.

■ We agree that a "hiatus" occurred in relation to any subject matter claimed in those patents which is also part of the species of controls elected for prosecution in the 1954 application. Nevertheless, it was error to conclude that the hiatus began with the 1960 cancellation of matter in the 1954 application. Even assuming, arguendo, that this cancellation was "voluntary" as indicated by the district court, any of the cancelled matter could have been reinstated into the 1954 application by Lemelson without raising any new matter objection, at least until the abandonment of that application in 1961. The hiatus we would observe runs from this latter event.

Lemelson argues for continuity of disclosure between the CIP applications and 1954 application through the link of the Rule 147 divisional application, because that application consisted of a complete copy of the original 1954 application. Contrary to the then applicable statutory requirements for being accorded the status of a complete application,[12] however, the Rule 147 appli-cation on which Lemelson is forced to rely to show a continuity of disclosure was not signed and thus does not on its own right establish continuity of disclosure as to all matter disclosed in the original 1954 application of which it was a copy.

■ Rule 147 is narrower than 35 U.S.C. § 120 and describes the unique circumstances under which in 1961 an application could have been filed without signature of the applicant. These circumstances were that the subject of that Rule 147 application had to be a "non-elected invention" disclosed in the parent application. Thus, the unsigned Rule 147 divisional application at issue here could only establish continuity of disclosure for any invention or species thereof not elected for prosecution in the parent 1954 application. Explicitly, the Rule 147 divisional could not be an application legally effective to maintain disclosure before the Patent Office of any Group II invention utilizing the species of controls elected for prosecution in the 1954 application, whatever that is ultimately found to have been.

2. *Claims of the Patents in Suit*

■ Accordingly, any claims of the '814 and '640 patents which read on the species of controls of the Group II invention elected for prosecution in the 1954 application would be invalid due to the "hiatus" in disclosure discussed above. It would be improper, however, in evaluating validity to view each patent in suit as an indivisible unit by looking to a purported invention of each. Rather, the scope of each individual claim must be examined on its own merits, apart from that of other claims, even in the same patent. 35 U.S.C. § 282.[13] *Accord*

---

12. The requirements for a complete application for patent were delineated in 35 U.S.C. § 111 (1958) as follows:

"§ 111. *Application for patent.*
"Application for patent shall be made by the inventor, except as otherwise provided in this title, in writing to the Commissioner. Such application shall include: (1) a specification as prescribed by section 112 of this title: (2) a drawing as prescribed by section 113 of this title; and (3) an oath by the applicant as pre-scribed by section 115 of this title. *The applica-* *tion must be signed by the applicant* and accom-panied by the fee required by law." (Emphasis added.)

13. In relevant part 35 U.S.C. § 282 (1982) reads as follows:

"§ 282. *Presumption of validity; defenses*
"A patent shall be presumed valid. Each claim of a patent (whether in independent, de-pendent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent

*Shelcore, Inc. v. Durham Industries, Inc.,* 745 F.2d 621, 624, 223 USPQ 584, 586 (Fed. Cir.1984).

If every claim of one of the patents in suit is determined after a trial to read on the elected species of controls, it would then be correct to conclude that such a patent is totally invalid. Even assuming, arguendo, that the elected species of controls is the "photoelectric" method, however, such a situation does not automatically follow here.

The specification of each of the two patents in suit discloses *both* photoelectric and electromechanical methods of effecting the control functions of slowing the carriage prior to stopping it at a preselected storage bin, as in the '640 patent, and detecting loads on the load support or in a storage bin, as in the '814 patent. Thus, even if the elected species of controls is found to encompass one of these two methods, claims in these patents to control functions which are accomplished by the other method could yet be valid and enforceable.

We admonish care, therefore, in sweeping conclusions about the validity of these patents. Some claims of each appear not to be limited to one or the other type of controls, but are broad enough to read on the photoelectric or electromechanical means. Others appear to be narrower and tailored to read exclusively on either one.

Accordingly, on remand, for purposes of ascertaining whether TRW has carried its burden on invalidity, inquiry is clearly required into the scope of each individual claim in the patents.

### III. CONCLUSION

The order granting summary judgment is vacated and this case is remanded for further proceedings consistent herewith.

Each party is to bear its own costs on appeal.

### VACATED AND REMANDED.

claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any

### APPENDIX A

Claim 1 of United States Patent No. 3,389,814 follows with bracketed material and paragraphing added:

1. Material handling apparatus for transporting loads to and from selected storage locations, said apparatus comprising [:]

[a.] a storage frame defining a multiplicity of vertically and horizontally arranged bins having open, load receiving ends,

[b.] a load carrier including a carriage movable past said open ends of said bins; said load carrier including

[i.] generally vertically extending horizontally movable mast structure supported by said carriage and

[ii.] a vertically movable elevator guided by said mast structure;

[c.] a laterally movable load support means carried by said elevator and movable generally horizontally into said bins;

[d.] power means for actuating said carriage, elevator and load support means;

[e.] automatic control means for effecting a series of movements whereby said carriage is moved to the horizontal position of a selected bin and said elevator is moved to the level of said selected bin, and said load support means is reciprocated laterally in a transfer movement to transfer a load between said load support means and said selected bin,

[i.] said control means including a first sequence control effecting an unloading movement whereby said load support means enters said selected bin in a high position and is lowered to deposit a load;

[ii.] said control means including a second sequence control effecting a loading movement whereby said load support means enters said selected bin

claim thereof shall rest on the party asserting such invalidity."

in a low position and is raised to pick up a load;

said load support means being so mounted with respect to said elevator that said load support means is disposed in spaced relationship to the defining storage frame elements of the selected bin during movement of said load support means into and out of said selected bin for respectively depositing a load into or removing a load from the selected bin;

[iii.] said control means including load sensing means on said load carrier selecting either said first sequence control or said second sequence control for activation during said sequence of movements,

said load support means including a generally horizontal upwardly facing surface adapted for supporting a load thereon, and

said sensing means being operatively connected to said load support means and responsive to a load positioned on said surface for activating said first sequence control and responsive to no load positioned on said surface for activating said second sequence control, and

[iv.] other sensing means on said load carrier for determining whether or not a load is already positioned in said selected bin, said control means being responsive to actuation of said other sensing means and preventing said load support means from moving into said selected bin.

## APPENDIX B

Claim 1 of United States Patent No. 3,486,640 follows with bracketed material and paragraphing added:

1. In an automatic warehousing system,

[a.] a storage frame defining a plurality of storage bins disposed in different bays and at different levels in each bay; with said storage bins having open load receiving ends disposed in a plane;

[b.] load carrier means including

[i.] a carriage movable generally horizontally past said storage frame to different bays and

[ii.] generally vertically extending mast structure supported by said carriage with an elevator mounted for vertical movement on said mast structure; and

[c.] cantilever type generally horizontally movable load handling means mounted on said elevator for movement into and out of said bins at different levels[,] and to a position as determined by the position of said elevator,

[said different levels being either] slightly lower or slightly higher than a selected level to pick up or deposit a load respectively;

said load carrier means being movable generally horizontally parallel with and adjacent to said plane for moving a load into or from a selected storage bin;

[d.] a plurality of power means for moving said carriage, said elevator, and said load handling means;

[e.] control means for activating said power means to cause said carriage, said elevator and said load handling means to execute a sequence of movements from a beginning position to a selected bin in a selected bay and at a selected level for depositing or picking up a load; said control means including

[i.] control element means mounted to move parallel with said plane with the movement of said load carrier means;

[ii.] actuating means associated with the selected storage bin actuating said control element means as said load carrier means approaches said selected storage bin; said actuating means being operative to so actuate said control means whereby the latter will first reduce the speed of movement of said load carrier means and then will precisely stop said load carrier means at said selected storage bin, with said control element means deactivating certain of said power means when said control element means is

actuated at said selected storage bin; said actuating means comprising

    [A.] a first actuator and

    [B.] a second actuator;

said control means being responsive to said first actuator to reduce the speed of movement of said carrier means, and being responsive to said second actuator to precisely stop said carrier means at said selected storage bin.